#29083-a-PER CURIAM
**2019 S.D. 59**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

CHARLES RUSSELL RHINES,                    Plaintiff and Appellant,

    v.

SOUTH DAKOTA DEPARTMENT
OF CORRECTIONS and MIKE
LEIDHOLT, Secretary, South
Dakota Department of Corrections,          Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JON C. SOGN
Judge

* * * *

DANIEL R. FRITZ
TIMOTHY R. RAHN
Ballard Spahr LLP
Sioux Falls, South Dakota                  Attorneys for plaintiff and
                                                            appellant.

JASON R. RAVNSBORG
Attorney General

PAUL S. SWEDLUND
Assistant Attorney General
Pierre, South Dakota                       Attorneys for defendant
                                                            and appellee.

* * * *

CONSIDERED ON BRIEFS
OCTOBER 15, 2019
OPINION FILED **10/25/19**

#29083

PER CURIAM

[¶1.]      Charles Rhines is a prisoner awaiting execution for a death sentence imposed following his first-degree murder conviction.  He brought a civil action challenging a Department of Corrections administrative policy relating to the method and procedures for carrying out capital sentences.  The circuit court granted the State's motion to dismiss, and Rhines appeals.  We affirm.

## Background

[¶2.]      Rhines killed Donnivan Schaeffer in March of 1992 while burglarizing a Rapid City doughnut shop.  A jury convicted Rhines of first-degree murder and recommended a sentence of death.  The circuit court[1] imposed the death sentence and issued a warrant of execution.  Rhines appealed to this Court, and we affirmed the conviction and sentence.  *State v. Rhines*, 1996 S.D. 55, 548 N.W.2d 415.  The United States Supreme Court later denied Rhines' request for a writ of certiorari. *Rhines v. South Dakota*, 519 U.S. 1013, 117 S. Ct. 522, 136 L. Ed. 2d 410 (1996).

[¶3.]      In the twenty-three years that have followed, Rhines has pursued collateral review of his conviction and sentence in state and federal courts.  Among these cases was a direct challenge to the State's lethal injection protocols under the current law and under the law as it existed at the time of Rhines' conviction and sentence.[2]  In an amended petition for a writ of habeas corpus, Rhines argued that

---

1.    The Honorable John K. Konenkamp, Circuit Court Judge, now a retired Justice of this Court.

2.    The information relating to this proceeding is contained in our court file in *Rhines v. Weber*, #26673 (2013).  It is included here for context and a more complete exposition of the facts.  We have not relied upon the information to

(continued . . .)

-1-

the State's protocols violated due process and the Eighth Amendment's proscription against cruel and unusual punishment. The issues were fully litigated during a court trial, which included expert medical testimony.

[¶4.] In its subsequent written decision, the circuit court[3] reviewed the parties' evidence against settled constitutional principles, made detailed findings of fact, and concluded the State's lethal injection protocols did not constitute cruel and unusual punishment. The circuit court denied Rhines' request for a certificate of probable cause, which would have allowed an appeal to this Court. *See* SDCL 21-27-18.1 (requiring a "certificate of probable cause that an appealable issue exists[]" for appellate review in a habeas case). Rhines then sought to invoke our original jurisdiction to issue a certificate, but we denied his motion, concluding he had not demonstrated probable cause that an appealable issue existed. Rhines' subsequent petition for certiorari to the United States Supreme Court was unsuccessful. *Rhines v. Weber*, 571 U.S. 1164, 134 S. Ct. 1002, 187 L. Ed. 2d 852 (2014).

[¶5.] In August of 2018, Rhines commenced this civil action in circuit court, seeking declaratory and injunctive relief. Rhines alleges he is not challenging the constitutionality of his death sentence or the death penalty itself. Instead, he claims that a written policy issued by the South Dakota Department of Corrections (DOC) relating to the execution of a condemned inmate is invalid because it was not

---

(. . . continued)
 reach our decision in this appeal. *See Jenner v. Dooley*, 1999 S.D. 20, ¶ 15, 590 N.W.2d 463, 470 (recognizing courts can take judicial notice of public records, including prior judicial proceedings).

3. The Honorable Thomas L. Trimble, Circuit Court Judge, now retired.

promulgated within the rule-making requirements of South Dakota's

Administrative Procedure Act (APA). *See* SDCL Ch. 1-26.

[¶6.]         The State moved to dismiss Rhines' complaint, arguing the DOC

policy, known as SDDOC Policy 1.3.D.3 ("the Policy" or "the DOC Policy"), was not

subject to APA rule-making requirements. The State cited provisions of the APA,

along with other statutory authority and decisional law from this Court and other

courts to support its claim that the Legislature has exempted DOC agency

statements like the Policy from the APA's requirements of notice and public

comment.

[¶7.]         The circuit court[4] agreed. After considering the parties' arguments, it

issued a written decision, dismissing Rhines' complaint, and determining that the

Policy was not a rule and therefore not subject to the APA. The court also

concluded that the authority of the DOC to carry out a death sentence was derived

from SDCL 23A-27A-32 whose provisions, the circuit court reasoned, were self-

executing.

[¶8.]         As this case was proceeding in circuit court, Rhines' habeas corpus

litigation came to a conclusion on April 15, 2019, with the United States Supreme

Court's decision denying certiorari to consider Rhines' federal habeas claims.

*Rhines v. Young*, 899 F.3d 482 (8th Cir. 2018), *cert. denied,* ___ U.S. ___, 139 S. Ct.

1567, 203 L. Ed. 2d. 730 (2019). The successor to the original sentencing court

issued a new warrant of execution ordering the warden of the South Dakota State

---

4.     The Honorable Jon C. Sogn, Circuit Court Judge.

Penitentiary to carry out Rhines' execution during the week of Sunday, November 3, 2019.

[¶9.]        Rhines now appeals the circuit court's order dismissing his APA challenge to the Policy.  The case was fully briefed as of October 2, 2019.  Citing his imminent execution, Rhines has asked this Court for an order staying the current execution date.  The State has resisted the stay request, arguing this appeal is simply what it believes to be the latest of Rhines' long-standing efforts to delay his execution.

[¶10.]        We have reviewed the record and the parties' submissions and have determined that we can decide the case on its merits without a stay.  We therefore address Rhines' principal issue on appeal, which we restate as follows:  Whether the circuit court erred when it determined the DOC Policy was not subject to the APA's rule-making requirements and granted the State's motion to dismiss.

**Analysis**

[¶11.]        Determining whether the Policy is subject to the APA requires an interpretation of several relevant statutes.  This is a legal question for which we accord the circuit court no deference and review de novo.  *See Mergen v. N. States Power Co.*, 2001 S.D. 14, ¶ 4, 621 N.W.2d 620, 621 (quoting *State v. Springer-Ertl*, 1997 S.D. 128, ¶ 4, 570 N.W.2d 39, 40) ("The construction of a statute and its application to the facts present questions of law, which we review de novo.").  Motions to dismiss under SDCL 15-6-12(b)(5) (Rule 12(b)(5)) test the legal sufficiency of the plaintiff's claim and necessarily implicate questions of law.  *Sisney v. Best Inc.*, 2008 S.D. 70, ¶¶ 6-8, 754 N.W.2d 804, 807-09.  For this reason, we also

review de novo a circuit court's determination of a Rule 12(b)(5) motion to dismiss. *Id.*

[¶12.]    When confronting a motion to dismiss under Rule 12(b)(5), "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Id.* ¶ 7, 754 N.W.2d at 808 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)). Although courts determining the motion are obligated to accept the truth of the complaint's factual allegations, they "are not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965). "The pleading must contain something more than a statement of facts that merely creates a suspicion of a legally cognizable right of action on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965).

[¶13.]    Our rules for construing statutory text are well-settled and may be concisely summarized as follows:

> The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute. The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used. Words and phrases in a statute must be given their plain meaning and effect. When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed.

*Discover Bank v. Stanley*, 2008 S.D. 111, ¶ 15, 757 N.W.2d 756, 761 (quoting *Martinmaas v. Engelmann*, 2000 S.D. 85, ¶ 49, 612 N.W.2d 600, 611).

#29083

*Applicability of the APA*

[¶14.] The APA provides a means by which interested parties can, in some instances, seek declaratory relief concerning an agency's rules:

> The validity or applicability of a rule may be determined in an action for declaratory judgment in the circuit court for the county of the plaintiff's residence, if it is alleged that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff.

SDCL 1-26-14.

[¶15.] We have held that SDCL 1-26-14 requires the existence of "an actual case or controversy." *In re Petition for Declaratory Ruling re SDCL 62-1-1(6)*, 2016 S.D. 21, ¶ 8, 877 N.W.2d 340, 343.[5] The statute also presupposes the existence of a rule that is subject to the APA. *See, e.g.*, *Moulton v. State*, 363 N.W.2d 405, 406-07 (S.D. 1985) (holding that the absence of an agency rule renders SDCL 1-26-14 inapplicable). Under the provisions of SDCL 1-26-14, a court could, for example, declare whether a putative rule was validly promulgated under the APA or determine whether the rule's provisions apply to a particular set of circumstances, provided that in either instance an actual controversy exists. *See, e.g.*, *Homestake Mining Co. v. Bd. of Envtl. Prot.*, 289 N.W.2d 561, 562 (S.D. 1980) (holding that

---

5. The APA also allows agencies to issue their own declaratory rulings without a case or controversy requirement and based upon hypothetical facts. *See In re SDCL 62-1-1(6)*, 2016 S.D. 21, ¶ 8, 877 N.W.2d at 343 (citing SDCL 1-26-15's requirement for agencies to adopt rules "for the . . . prompt disposition of petitions for declaratory rulings as to the applicability of any statutory provision or of any rule or order of the agency"). Inmates, however, may not seek declaratory relief under the provisions of SDCL 1-26-15, which specifically provides that "[n]o inmate . . . may petition an agency for a declaratory ruling on the applicability of statutory provisions, rules, or orders of the agency."

-6-

SDCL 1-26-14 was the correct procedure for challenging the validity of administrative rules promulgated under the APA).

[¶16.]     Here, Rhines' effort to invoke SDCL 1-26-14 and obtain relief under the APA rests upon the premise that the Policy is an APA rule.  However, we are not convinced the premise is sound.

[¶17.]     South Dakota's APA imposes rule-making requirements upon agencies seeking to adopt, amend, or repeal administrative rules.  *See generally* SDCL 1-26-4.  Included among these requirements is an agency's obligation to publish notice of the proposed rule change and conduct a hearing to allow public comment.  *Id.*  Whether an agency's statement is subject to these rule-making requirements requires the interior determination of whether the statement is actually a rule.

[¶18.]     A rule subject to the APA is an "agency statement of general applicability that implements, interprets, or prescribes law, policy, procedure, or practice requirements of any agency."  SDCL 1-26-1(8).  However, the Legislature has excluded from this definition certain agency statements, including those involving "[i]nmate disciplinary matters as defined in § 1-15-20[.]"  SDCL 1-26-1(8)(g).

[¶19.]     The text of SDCL 1-15-20 contains two distinct legislative determinations of public policy.  The first paragraph of the statute states that the DOC "at any time may promulgate rules[ ] pursuant to chapter 1-26" in five specific

areas, none of which Rhines alleges is applicable. SDCL 1-15-20.[6] More relevant to our consideration here is the statute's second paragraph, which further provides that the DOC "may prescribe departmental policies and procedures for the management of its institutions and agencies, including inmate disciplinary matters." *Id.*

[¶20.]       Our interpretation of SDCL 1-15-20 leads us to conclude that the Legislature has limited the DOC's rule-making authority to the five enumerated topical areas, while also authorizing the DOC to prescribe policies and procedures for discharging its unique responsibilities. These policies and procedures, as they relate to inmate disciplinary matters, are not subject to the APA.

[¶21.]       This construction of SDCL 1-15-20 is confirmed by a plain reading of SDCL 1-26-1(8)(g), which specifically excludes "inmate disciplinary matters"—a phrase that sounds narrower than it is. In truth, SDCL 1-15-20 defines "inmate disciplinary matters" broadly as "*all* matters relating to individual inmate behavior and . . . *all* matters relating to the maintenance of order, control, and safety within any institution under the supervision of the Department of Corrections." Reading SDCL 1-26-1(8)(g)'s APA exclusion for "inmate disciplinary matters" together with the definition contained in SDCL 1-15-20, we conclude that the APA does not apply to "all matters relating to individual inmate behavior" or "all matters relating to the maintenance of order, control, and safety within any institution under the supervision of the Department of Corrections." SDCL 1-15-20.

---

6.       The five areas are: (1) public contact with inmates; (2) inmate release dates; (3) parole standards; (4) out-of-state and federal inmates; and (5) inmate accounts.

[¶22.] Applying these statutory rules here, we determine that the Policy is not a rule subject to the requirements of the APA. The Policy is entitled "Execution of an Inmate" and states that the DOC will "carry out the execution of an inmate in accordance with chapter 23A-27A[,]" adding that the execution "will be conducted in a professional, humane and dignified manner." Among other things, the Policy regulates the number and type of witnesses an inmate can request, arrangements and procedures for the inmate's movements immediately preceding the execution, the inmate's final visit, and the inmate's opportunity to make a final statement. These DOC agency determinations fall within the broad scope of regulating "all matters relating to individual inmate behavior." SDCL 1-15-20.

[¶23.] In addition, the Policy also contemplates the need for order, control, and safety as part of carrying out the penalty of death. For example, the Policy addresses the methods and procedure for the execution itself. In large part, these provisions reflect the DOC's effort to adhere to the Unites States Supreme Court's decision in *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008). In *Baze*, the United States Supreme Court held that the use of lethal injection as a method of execution did not constitute cruel and unusual punishment. *Id.* at 47, 128 S. Ct. at 1529. A plurality of the Court further expressed the view that lethal injection would transgress the Eighth Amendment only if it presents a "'substantial risk of serious harm,' an 'objectively intolerable risk harm.'" *Id.* at 50, 128 S. Ct. at 1531 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846, and n.9, 114 S. Ct. 1970, 1981, 1983, and n.9, 128 L. Ed. 2d 811 (1994)). The Policy is, therefore, an effort to ensure order, control, and safety in the actual execution process.

[¶24.] Beyond this, other provisions of the Policy are further directed at ensuring order, control, and safety for the benefit of those conducting and witnessing the execution. The Policy prescribes requisite qualifications and training for those carrying out the individual steps associated with the execution. It also references statutory provisions contained in SDCL chapter 23A-27A, which regulate the details of the execution's time and place,[7] along with the selection of witnesses, standards for witness behavior, and media relations. In essence, the Policy serves as a resource that consolidates and restates governing statutory provisions and incorporates the DOC's policies and procedures for carrying out an execution.

[¶25.] Rhines' argument that the Policy does not address inmate disciplinary matters overlooks the breadth of its statutory definition. *See* SDCL 1-15-20. His related claim that similar statutory APA exemptions for corrections agencies in other states are broader than the definition in SDCL 1-15-20 misses the mark. Even if we were to grant the point, it does not follow that the definition contained in SDCL 1-15-20 is too narrow to encompass the DOC Policy. Indeed, we believe the definition to be broad in its own right and sufficient to include the provisions of the Policy.

[¶26.] In addition, Rhines misreads the other provisions of SDCL 1-15-20 by suggesting courts have the authority to add execution procedures to the list of five specific areas within which the DOC "may promulgate rules." We disagree and, as

---

7. The execution must take place "within the walls of some building at the state penitentiary[.]" SDCL 23A-27A-32.

indicated above, believe the better reading of the statute authorizes the DOC to promulgate APA-compliant regulations in the five enumerated areas and otherwise prescribe "policies and procedures for the management of its institutions and agencies, including inmate disciplinary matters." *Id.*

[¶27.] Because the Policy does not fit within the APA's definition of a "rule," it is not subject to the APA.[8] The circuit court correctly reached the same conclusion, and its decision to dismiss Rhines' complaint could be affirmed on this basis alone.

[¶28.] More fundamentally, though, Rhines' action contains an additional limitation—it incorrectly presupposes the Policy is the only basis of the State's authority to carry out a sentence of death. We, therefore, write further to clarify the nature of the State's authority in this regard and provide an additional basis for denying Rhines' request to enjoin his execution.

### The State's Authority to Carry out a Death Sentence

[¶29.] "The Constitution allows capital punishment." *Bucklew v. Precythe,* ___ U.S. ___, 139 S. Ct. 1112, 1122, 203 L. Ed. 2d 521 (2019) (citing *Glossip v. Gross,* ___ U.S. ___, 135 S. Ct. 2726, 2731-33, 192 L. Ed. 2d 761 (2015); *Baze,* 553 U.S. at 47, 128 S. Ct. at 1520). Of course, the fact that the death penalty does not violate the Constitution does not mean that states are obligated to permit it. *See id.* South

---

8. The parties and the circuit court also addressed the possibility that the Policy is excluded from SDCL 1-26-1(8)'s definition of a rule under the provisions of SDCL 1-26-1(8)(a), which excludes "[s]tatements concerning only the internal management of an agency and not affecting private rights or procedure available to the public[.]" However, given our determination that the Policy is excluded from the APA under SDCL 1-26-1(8)(g), it is unnecessary to reach the question of whether it is also excluded by another statutory provision.

Dakota, however, does. Acting through its popularly-elected Legislature, South Dakota is among a majority of states that allow capital punishment.[9] This case is not about the efficacy of capital punishment, which we recognize implicates deeply held convictions among many.[10]

[¶30.] The Legislature has enacted detailed statutory standards and requirements for the prosecution of capital cases and the imposition of the death penalty. *See* SDCL Ch. 23A-27A.[11] Included within this group is SDCL 23A-27A-32, which provides in relevant part:

> The punishment of death shall be inflicted by the intravenous injection of a substance or substances in a lethal quantity. The warden, subject to the approval of the secretary of corrections, shall determine the substances and the quantity of substances used for the punishment of death. An execution carried out by intravenous injection shall be performed by persons trained to administer the injection who are selected by the warden and approved by the secretary of corrections.

---

9. Federal law also permits the imposition of a death sentence. *See* 18 U.S.C. Ch. 228.

10. Nor does this case concern Rhines' opportunity to object to the method of his execution. As discussed above, Rhines unsuccessfully litigated the constitutionality of the State's lethal injection protocols in 2013. Though he claims his current action is merely a reflection of his interest in seeing that all executions are carried out in a "professional, humane and dignified manner," he has not explained how this interest differs in any meaningful way from his interest in ensuring his execution did not violate the Constitution's prohibition on cruel and unusual punishments.

11. Chapter 23A-27A does not contain any express authority for the DOC to promulgate regulations concerning procedures for carrying out a death sentence.

[¶31.]     In addition to identifying the method of execution,[12] the Legislature has also provided explicit authority for the warden to carry out a death sentence. *See* SDCL 23A-27A-31 ("The warden shall execute the warrant of death sentence and execution accordingly."); SDCL 23A-27A-37.1 (requiring the DOC secretary to appoint a replacement in the event of the warden's disability "to carry out the warrant of death sentence and execution and to perform all other duties imposed upon the warden by this chapter[]"). The DOC Policy at issue in this case does not make the warden's responsibility to carry out a death sentence any more or less authorized. Indeed, in the absence of the Policy, the DOC secretary and the warden would still be obligated to conduct an execution directed by a sentencing court's warrant. *See* SDCL 23A-27A-15 and SDCL 23A-27A-31.

[¶32.]     Though the context differed, we reached a similar conclusion in *Clay v. Weber*, 2007 S.D. 45, 733 N.W.2d 278. There we held that any failure to treat policies for charging inmates' prison accounts for the costs of their confinement as APA rules was not consequential. *Id.* ¶ 12, 733 N.W.2d at 283-84. Even in the absence of the policies, penitentiary officials were authorized by statute to charge inmates' accounts for the costs. *Id.*

[¶33.]     Here, the same analysis applies. The provisions of SDCL Chapter 23A-27A relating to the methods and procedures for carrying out a death sentence

---

12.   The text of SDCL 23A-27A-32 was amended in 2007 and 2008, but the language prior to 2007 contains the same method of execution by lethal injection: "The punishment of death shall be inflicted by the intravenous administration of a lethal quantity of an ultra-short-acting barbiturate in combination with a chemical paralytic agent . . . An execution carried out by lethal injection shall be performed by a person selected by the warden and trained to administer the injection[.]" 1984 S.D. Sess. L. ch. 181.

#29083

are self-executing, and they—not the DOC Policy—vest members of the executive branch with the authority to carry out a capital sentence. To conclude otherwise overlooks the primacy of these statutes and exalts the Policy to preeminence.

[¶34.]    We affirm.[13]

[¶35.]    GILBERTSON, Chief Justice, JENSEN and SALTER, Justices, and COMER and SHELTON, Circuit Court Judges, concur.

[¶36.]    COMER, Circuit Court Judge, sitting for KERN, Justice, disqualified.

[¶37.]    SHELTON, Circuit Court Judge, sitting for DEVANEY, Justice, disqualified.

---

13.    Given our disposition of this appeal on its merits, Rhines' motion for a stay is rendered moot and denied on that basis.

-14-